**Mohammed Zahid ASLAM, Plaintiff,**

**v.**

**Michael MUKASEY, Attorney General, et al., Defendants.**

**No. 1:07cv331 (LMB/BRP).**

United States District Court,
E.D. Virginia,
Alexandria Division.

Jan. 25, 2008.

---

Mohammad Zahid Aslam, Alexandria, VA, Pro se.

Dennis Carl Barghaan, Jr., United States Attorney's Office, Alexandria, VA, for Defendants.

## MEMORANDUM OPINION

LEONIE M. BRINKEMA, District Judge.

Plaintiff Mohammad Aslam filed this civil action *pro se* to compel the defendants to take action on his I–485 application for adjustment of immigration status to lawful permanent resident. Aslam alleges, and the government has confirmed, that the only obstacle to final adjudication of his application is the Federal Bureau of Investigation's ("FBI") failure to complete and

submit to the United States Citizenship and Immigration Services ("CIS") a name check of Aslam. As a result of this delay, Aslam's application with CIS has been pending for nearly three years.

Both parties have filed cross motions for summary judgment. For the reasons stated in open court and in this memorandum opinion, plaintiff's Motion for Summary Judgment will be granted in part and denied in part and the defendants' Motion for Summary Judgment will be granted in part and denied in part.

## Background

### I. Aslam's CIS application

Mohammed Aslam, a native of Pakistan, lawfully entered this country in 1990 when he was sixteen years old. He has since completed high school and college and now maintains active employment as a field test engineer with Kinecticom, Inc. In 1996, Aslam applied for lawful permanent residency as an immediate family member of a diplomat. He submitted Form I-485 to the Immigration and Naturalization Service ("INS")—CIS's predecessor agency. INS never acted on that application.

In January 2005, Aslam married a United States citizen—Sadiya Choudry. On February 21, 2005, he filed a second Form I-485, seeking to adjust his status as a result of his marriage. On April 1, 2005, and July 22, 2005, CIS submitted a request for a name check on Aslam to the FBI as part of the application process.[1]

On January 25, 2006, a CIS adjudicator interviewed Aslam. Although the adjudicator recommended approval of Aslam's application, he directed Aslam to submit additional documentation and cautioned Aslam that final approval could not occur until the FBI name check was complete. See Dibbins Decl. ¶ 6. Aslam promptly filed the requested documents with CIS after the interview. Id.

Since then, Aslam has repeatedly inquired about the status of his application, but has received no additional information. On April 5, 2007, he filed the instant action pro se seeking to compel CIS to adjudicate his application. Aslam's complaint named the Attorney General, the Secretary of Homeland Security, and the directors of CIS and the FBI as defendants. The Court denied the government's motion to dismiss on July 13, 2007.

As of January 25, 2008, the FBI has not completed the name check. CIS has conducted renewed fingerprint checks and a follow-up interview. On July 31, 2007, the CIS adjudicator concluded that Aslam's marriage was legitimate and, again, recommended approval of his application pending completion of the name check.

### II. FBI Name Check Process

As a matter of policy, CIS submits a request for an FBI name check for every applicant that seeks adjustment of status and stays final adjudication of an application until the results of the name check are received. See Dibbins Decl. ¶ 1. The name check process proceeds in four discreet stages: (1) submission; (2) name search; (3) file review; and (4) dissemination. See Cannon Decl. ¶¶ 13–15. The first step—submission—is entirely computerized. The FBI runs a generic search for the particular name in its Universal Index—an index of the FBI's 98.9 million records. When the name or other identifying information matches a record, a "hit" is generated. If no hit is generated, the name check is completed at this first step. Approximately 68% of cases are resolved at this stage within 48 to 72 hours. Id. ¶ 13.

---

1. CIS further submitted Aslam's fingerprints to the FBI and ran his name through the Interagency Border Inspection System. Nei-
ther of these actions produced negative records. See Dibbins Decl. ¶¶ 9–10.

At the second stage, an FBI analyst manually inserts the name into the FBI system to confirm the hits generated at the initial stage and to identify all the FBI records potentially associated with the given name. This step, which takes 30 to 60 days, resolves 90% of the requests because many hits from the first stage are false alarms. *Id.* ¶ 14.

At the third stage, an analyst conducts a preliminary review of the identified FBI files, both paper and electronic, to determine whether the file in question truly references the individual in question. *Id.* ¶ 15.

The final "dissemination" stage is the most time intensive. The FBI analyst obtains all of the files resulting in "hits," including those stored at local field offices. *Id.* ¶ 27. He then determines whether the information in a particular file references the individual and, if so, assesses whether that information is derogatory. *Id.* ¶ 17.

The government concedes that the agency within the FBI responsible for name checks, the National Name Check Program Section ("NNCPS"), is understaffed. Approximately 3.3 million name checks are requested each year, resulting in 330,000 checks that proceed past the second stage. As of 2006, NNCPS only employed 103 personnel, 59 of which are dedicated to performing name checks for CIS. To meet its internal goals, the FBI has estimated that it needs 180 employees to process the CIS requests alone.

### III. Status of Aslam's Application

Despite the Court's repeated requests to the government to provide specific information about the status of Aslam's name check, the only details provided are that Aslam's name passed through the second stage of the name check process on May 12, 2005 and was released into the fourth "dissemination" stage on August 5, 2005 and October 12, 2005. *See* Cannon Decl.

¶¶ 38–39. The documents provided by the government do not reveal the number of generated "hits" or files that need to be investigated, nor do they even confirm that processing at the fourth stage has begun.

### Jurisdiction

. Earlier in this litigation, the defendants moved to dismiss the complaint for lack of subject matter jurisdiction over the issues raised by Aslam. In its oral ruling on July 13, 2007, the Court concluded that it had federal question jurisdiction over Aslam's claims to compel agency action under the Administrative Procedures Act ("APA"), 5 U.S.C. § 706(1), and the Mandamus Act, 28 U.S.C. § 1361, specifically rejecting the government's claim that the Immigration and Nationality Act ("INA") stripped the Court of jurisdiction to hear this matter.

Under the INA, the decision whether or not to grant a petition for adjustment of status is committed to the discretion of the Secretary of Homeland Security. 8 U.S.C. § 1255(a). The INA divests the courts of the authority to review two categories of cases: (1) "any judgment regarding the granting of relief," and (2) "any other decision or action ... specified under this subchapter to be in the discretion of the Attorney General or the Secretary of Homeland Security." *See* 8 U.S.C. § 1252(a)(2)(B)(i), (ii). Since the Secretary has not yet issued a "judgment" on the merits of Aslam's application, only the second category is at issue.

Recognizing the "well-settled presumption favoring interpretations of statutes that allow judicial review of administrative action," *McNary v. Haitian Refugee Ctr., Inc.*, 498 U.S. 479, 496, 111 S.Ct. 888, 112 L.Ed.2d 1005 (1991), a plain reading of Section 1252(a)(2)(B)(ii) confirms that the INA only strips the judiciary of jurisdiction to review those discretionary decisions and actions that are "specified under this

subchapter." [2] *See Khan v. Att'y Gen.*, 448 F.3d 226, 232 (3d Cir.2006) ("The key to § 1252(a)(2)(B)(ii) lies in its requirement that the discretion giving rise to the jurisdictional bar must be 'specified' by statute.") (citation and alterations omitted); *Ahmed v. Gonzales*, 447 F.3d 433, 436 (5th Cir.2006) (same); *Spencer Enter., Inc. v. United States*, 345 F.3d 683, 689 (9th Cir. 2003) (same). Although the INA places the decision of whether to adjust status in the sound discretion of the Secretary, it says nothing about the Secretary's discretion to set the pace of that decision. Accordingly, the Court retains jurisdiction under the APA to determine whether the Secretary has unlawfully delayed or withheld final adjudication of a status adjustment application.

This conclusion is supported by the way in which Congress titled this statutory subparagraph, as "Denials of discretionary relief," and by the concern to which this subparagraph was directed. As the legislative history reveals, Congress was

concerned that judicial review was unduly interfering with decisions to remove problematic aliens. *See Tang v. Chertoff*, 493 F.Supp.2d 148, 152 (D.Mass.2007) ("[T] he original purpose of this subparagraph was to ensure removal of those individuals adjudicated removable by making the Attorney General's decision final as to relief by adjustment of status.") (citing S.Rep. No. 104–249 (1996); H.R.Rep. No. 104–469 (1996)). With that goal in mind, Congress removed adjustment decisions and accompanying orders of removal from the purview of the federal courts. Aslam's case does not implicate those concerns because he is not asking a federal court to frustrate a denial of discretionary relief, but rather to compel a decision on whether he is entitled to that relief.

Although there is conflicting authority in this district, *see Safadi v. Howard*, 466 F.Supp.2d 696 (E.D.Va.2006); *Patil v. Mueller*, No. 1:07–71, 2007 WL 1302752 (E.D.Va. April 30, 2007),[3] a majority of the district courts addressing the issue have found jurisdiction.[4]

---

**2.** The phrase "this subchapter" refers to subchapter II of Chapter 12 of Title 8. *See* 8 U.S.C. §§ 1151–1378.

**3.** *See also Dossioukov v. Mukasey*, No. 07–C–5732, 2008 WL 163683, at *2 (E.D.Wis. Jan. 15, 2008); *Conigliaro v. Chertoff*, No. 07–1543, 2008 WL 108953, at *6 (D.N.J. Jan. 9, 2008); *Mighri v. Gonzales*, No. 07–3624, 2007 WL 4463590, at *2–4 (E.D.Pa. Dec. 19, 2007); *Orlov v. Howard*, 523 F.Supp.2d 30, 33–34, 2007 WL 4293490, at *4 (D.D.C.2007); *Torres v. Chertoff*, 1:07–1649, 2007 WL 4261742, at *4 (N.D.Ga. Nov. 30, 2007); *Luo v. Keisler*, 521 F.Supp.2d 72 (D.D.C.2007); *Korobkova v. Jenifer*, No. 07–11335, 2007 WL 3245178, at *4 (E.D.Mich. Nov. 2, 2007); *Liu v. Gonzales*, No. 07–1797, 2007 WL 2916511, at *4 (D.N.J. Oct. 5, 2007); *Abanov v. Gonzales*, No. 06–3725, 2007 WL 2872765, at *4 (S.D.Tex. Sept. 28, 2007); *Zeng v. Upchurch*, No. 2:06–CV–112, 2007 WL 2694253, at *3 (D.N.D. Sept. 11, 2007); *Li v. Chertoff*, 482 F.Supp.2d 1172, 1176–79 (S.D.Cal.2007); *Grinberg v. Swacina*, 478 F.Supp.2d 1350, 1354 (S.D.Fla.2007).

**4.** *See, e.g., Ren v. Mueller*, No. 6:07–790, 2008 WL 191010, at *6 (M.D.Fla. Jan. 22, 2008); *Camerena v. Chertoff*, No. 07–C–822, 2008 WL 161481, at *3–4 (N.D.Ill. Jan. 16, 2008); *Lindems v. Mukasey*, 530 F.Supp.2d 1044, 1046–47, 2008 WL 171078, at *2 (E.D.Wis.2008); *Xia v. Gonzales*, No. C07–728, 2008 WL 168672, at *1 (W.D.Wash. Jan. 15, 2008); *Al Kurdy v. USCIS*, No. 8:07–225, 2008 WL 151277, at *4 (D.Neb. Jan. 10, 2008); *Garrido v. Mueller*, No. 307–CV–1502, 2008 WL 89631, at *4 (N.D.Tex. Jan. 8, 2008); *He v. Chertoff*, 528 F.Supp.2d 879, 886, 2008 WL 36634, at *7 (N.D.Ill.2008); *Sherdil v. Chertoff*, No. 07–629, 2007 WL 4564111, at *2 (D.Ariz. Dec. 20, 2007); *Ansari v. U.S. Citizenship & Immigration Serv.*, No. 8:07–CV–160, 2007 WL 4553920, at *4 (D.Neb. Dec. 18, 2007); *Mitova v. Chertoff*, No. 07–2631, 2007 WL 4373045, at *3 (E.D.Pa. Dec. 13, 2007); *Zhu v. Chertoff*, 525 F.Supp.2d 1098, 1100, 2007 WL 4365733, at *2 (W.D.Mo.2007); *Jin v. Heinauer*, No. 2:07–0068, 2007 WL 4287657, at *3 (S.D.Ohio Dec. 4, 2007); *Ahmadi v. Chertoff*, No. 3:07–0255, 2007 WL 4181659, at *2 (N.D.Tex. Nov. 27, 2007); *As-

*Safadi* concluded that the INA prohibited judicial review of "*any* act or series of acts that is discretionary within the adjustment of status process," including the Secretary's decision to complete background and security checks and, by implication, the pace at which those checks proceed. 466 F.Supp.2d at 699. *Safadi* would, therefore, appear to treat inaction by the Secretary as "action" under the INA. Such a conclusion would lead to the unacceptable result that as long as CIS confirms that the applicant's name had been submitted to the FBI, courts would have no jurisdiction to review any delays, no matter how long or inexcusable. *See Sierra Club v. Thomas,* 828 F.2d 783, 793 (D.C.Cir.1987) ("[I]naction represents action that has been 'unlawfully withheld' . . . .").

Perhaps recognizing this conundrum, the *Safadi* court qualified its reasoning by recognizing that it was not addressing a circumstance where "USCIS refused altogether to process an adjustment application or where the delay was so unreasonable as to be tantamount to a refusal to process the application." 466 F.Supp.2d at 700. The very inclusion of this disclaimer undermines *Safadi's* central conclusion that the INA imposes an absolute jurisdictional bar to a federal court's consideration of the pace of the government's adjudication.

Congress quite sensibly committed the merits of the decision on applications for adjustment of status to the Executive Branch, which, by its nature, retains the competence and expertise to evaluate whether a particular individual is eligible for legal permanent residence. At the same time, it is clear from the text of the INA that Congress intended the Secretary of Homeland Security to process and act on applications.[5] If the pace of the Secretary's decision were immune from judicial review, the Executive Branch could unilaterally impose a *de facto* moratorium on all adjustment of status applications simply by delaying a final decision. For these reasons, the Court rejects the reasoning in

rani v. Chertoff, No. 07–1673, 2007 WL 3521366, at *3 (D.Minn. Nov. 14, 2007); *Shah v. Hansen,* No. 1:07–CV–1576, 2007 WL 3232353, at *4 (N.D.Ohio Oct. 31, 2007); *Saleem v. Keisler,* No. 06–C–712–C, 2007 WL 3132233, at *4–5 (W.D.Wis. Oct. 26, 2007); *Belegradek v. Gonzales,* No. 1:07–CV–0589, 2007 WL 3091078, at *2 (N.D.Ga. Oct. 18, 2007); *Sawad v. Frazier,* No. 07–1721, 2007 WL 2973833, at *2–3 (D.Minn. Oct. 9, 2007); *Bondarenko v. Chertoff,* No. 07–MC–00002, 2007 WL 2693642, at *5 (W.D.N.Y. Sept. 11, 2007); *Dong v. Chertoff,* 513 F.Supp.2d 1158, 1165 (N.D.Cal. Sept.6, 2007); *He v. Chertoff,* No. 2:07–14, 2007 WL 2572359, at *3 (D.Vt. Sept. 4, 2007); *Liu v. Novak,* 509 F.Supp.2d 1, 6–7 (D.D.C.2007); *Tang v. Chertoff,* No. 07–203, 2007 WL 2462187, at *4 (E.D.Ky. Aug. 29, 2007); *Liu v. Chertoff,* No. 06–2808, 2007 WL 2433337, at *4 (E.D.Cal. Aug. 22, 2007); *Totonchi v. Gonzales,* No. 1:07–256, 2007 WL 2331937, at *3–4 (N.D.Ohio Aug. 13, 2007); *Cao v. Upchurch,* 496 F.Supp.2d 569, 573 (E.D.Pa.2007); *Konchitsky v. Chertoff,* No. 07–294, 2007 WL 2070325, at *3 (N.D.Cal.

July 13, 2007); *Landry v. Chertoff,* No. 07–506, 2007 WL 2007996, at *2–3 (E.D.La. July 5, 2007); *Tang,* 493 F.Supp.2d at 153–54; *Qiu v. Chertoff,* No. C07–0578, 2007 WL 1831130, at *3 (N.D.Cal. June 25, 2007); *Pool v. Gonzales,* No. 07–258, 2007 WL 1613272 (D.N.J. June 1, 2007); *Koren v. Chertoff,* No. 3:07–CV–157, 2007 WL 1431948, at *3 (D.Conn. May 14, 2007); *Huang v. Gonzales,* No. C07–96, 2007 WL 1302555, at *3, (W.D.Wash. May 2, 2007); *Linville v. Barrows,* 489 F.Supp.2d 1278, 1282 (W.D.Okla. 2007); *Duan v. Zamberry,* No. 06–1351, 2007 WL 626116, at *2–3 (W.D.Pa. Feb. 23, 2007).

5. The INA's enabling regulations also impose a duty on the Secretary of Homeland Security to process adjustment of status applications. *See* 8 C.F.R. § 245.2(a)(5)(i) (requiring that each "applicant *shall* be notified of the decision of the director") (emphasis added); § 245.6 (requiring that "[e]ach applicant for adjustment of status under this part *shall* be interviewed by an immigration officer") (emphasis added).

*Safadi* and joins the majority of district courts that have found jurisdiction.

### Standard of Review

Summary judgment is appropriate if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In ruling on a motion for summary judgment, a court should accept the evidence of the nonmovant, and all justifiable inferences must be drawn in his favor. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). There are no material facts in dispute. The only question before the Court is whether, based on those facts, Aslam is entitled to relief.

### Discussion

■ In seeking to compel the government to adjudicate his application, Aslam has invoked the Administrative Procedure Act and the Court's mandamus power. Under 5 U.S.C. § 706(1), a reviewing court has the authority to "compel agency action unlawfully withheld or unreasonably delayed." Aslam may invoke the remedy of mandamus "by proving the co-existence of three elements: (1) the petitioner has shown a clear right to the relief sought; (2) the respondent has a clear duty to do the particular act requested by the petitioner; and (3) no other adequate remedy is available." *Estate of Michael ex rel. Michael v. Lullo,* 173 F.3d 503, 512–13 (4th Cir.1999).

As the government notes, a suit to compel agency action under the APA is conceptually similar to a petition for mandamus based on agency delay. *See Nat'l Ass'n of Home Builders v. U.S. Army Corps of Engineers,* 417 F.3d 1272, 1280 (D.C.Cir.2005). To evaluate the merits of Aslam's complaint, the Court must first determine whether the two agencies—CIS and the FBI—owe a legal duty to Aslam to act on his application and the associated name check. *Id.* If so, the Court must then determine whether those agencies have "unreasonably delayed" in discharging that duty. *Id.*

### I. Legal Duty

"[T]he only agency action that can be compelled under the APA is action legally *required.*" *Norton v. So. Utah Wilderness Alliance,* 542 U.S. 55, 63, 124 S.Ct. 2373, 159 L.Ed.2d 137 (2004). As discussed above, the first determination is easy: the Secretary of Homeland Security has a nondiscretionary duty to act on Aslam's adjustment of status application.[6] The remaining issue is whether the Secretary has an accompanying duty to adjudicate his application within a certain period of time.

■ The INA mandates no particular time frame in which the Secretary must complete his review of adjustment of status application. Nevertheless, as an agency of the Executive Branch, the Department of Homeland Security is subject to the catchall time requirement of the APA:

> With due regard for the convenience and necessity of the parties or their repre-

---

**6.** The INA does not, however, impose any nondiscretionary legal obligation on the FBI to process name check requests for adjustment of status applicants. The FBI is involved in the process only because the CIS has adopted a *policy* of requesting a name check before final adjudication of an application and the FBI has acceded to those requests. *See Konchitsky,* 2007 WL 2070325, at

*6 ("[T]he FBI's involvement in adjudicating I–485 applications arises not by statute or duty otherwise imposed by law, but by contract between USCIS and the FBI."). Accordingly, neither the APA nor the Mandamus Act permits the Court to compel the FBI into action. The Court will therefore dismiss the Attorney General and the FBI Director as defendants in this suit.

sentatives and *within a reasonable time,* each agency shall proceed to conclude a matter presented to it.

5 U.S.C. § 555(b) (emphasis added). Absent this timeliness requirement, the Secretary could defeat the clear intent of Congress simply by withholding performance of his statutory duty indefinitely. *See Tang,* 493 F.Supp.2d at 150 ("The duty to act is no duty at all if the deadline is eternity."). Accordingly, the Court concludes that CIS has a legal obligation to adjudicate Aslam's petition within a reasonable period of time.

CIS asserts that is has processed Aslam's application expeditiously and blames the delay on the FBI's failure to complete the name check. This argument lacks merit. By requesting name checks on every adjustment of status application, CIS has effectively deputized the FBI to complete an important element of its adjudication. It cannot now disclaim its legal responsibilities due to delays in that agency. *Cf. Shah,* 2007 WL 3232353, at *5 n. 3 (concluding that CIS must "ensure that the FBI is acting within a reasonable time" as part of its own duty "to adjudicate plaintiff's application in a reasonable time"). If a delay is unreasonable under the law, CIS must bear the consequences. To hold otherwise would allow an executive branch agency to frustrate a requirement of timely adjudication by farming out a portion of its review to a separate unaccountable agency in the federal bureaucracy. *Cf. Paunescu v. I.N.S.,* 76 F.Supp.2d 896, 902 n. 2 (N.D.Ill.1999) (noting that "defendants have tried to deftly transfer blame and responsibility from one governmental entity to another").

## II.  Unreasonable Delay

The Court must next determine whether the delay in this case is unreasonable. As the third year anniversary of his application submission nears, the Court concludes that Aslam has established a prima facie case of unreasonable delay. *See, e.g., Yu v. Brown,* 36 F.Supp.2d 922, 932 (D.N.M.1999). His name check has been stuck in the fourth stage since October 12, 2005. Since that time, Aslam has appeared for a second interview, a second criminal record and fingerprint check, and has again been recommended for adjustment of status pending the completion of the name check. Aslam has also made repeated inquiries as to the status of his application and CIS's answers have been non-responsive. For the purposes of prevailing on its motion for summary judgment, the government must justify this inaction with a response.

The government argues, and the Court agrees, that the length of the delay alone is not dispositive to this inquiry. Rather, assessing the unreasonableness of a particular delay is a highly fact-specific inquiry that looks to the nature of the adjudication at issue and the relative interests in play. To accomplish this task, courts generally employ a six-factor analysis first set forth in *Telecommunications Research & Action Ctr. v. FCC ("TRAC"),* 750 F.2d 70 (D.C.Cir.1984).

### A.  Nature and Complexity of the Name Check

Under the first TRAC factor, "the time agencies take to make decisions must be governed by a 'rule of reason.'" *Id.* at 80. An agency must be given adequate time to complete an adjudication that is complex or labor intensive. Accordingly, the Court must evaluate the reasonableness of CIS's delay based on the unique features of the name check process.

The government seizes on this factor, invoking the complexity of the fourth stage of name check process. An analyst must obtain any file, electronic or paper, that is associated with a particular "hit," review the contents of those files, and determine

whether there is derogatory information. The government also cites to resource constraints on the FBI and that agency's efforts to reduce its backlog and processing times.

Although CIS, and the FBI by implication, should be granted a reasonable period of time to complete a name check, what constitutes a reasonable period will vary by the specific circumstances of the case: the number of "hits" associated with a given name check, how many files must be collected, the difficulty in obtaining those files, etc. However, it is the government's burden to offer an explanation for a particular delay. A multi-year delay might be reasonable for a name check that generated several hundred hits, but probably not for a name check that generated only one hit.

The government has failed to meet this minimal burden. Instead of explaining why Aslam's name check has taken so long, it has provided a generic description of the fourth stage process: Aslam's name check entered the fourth stage of the FBI's review process, a stage that is generally time-intensive and cumbersome; therefore, the delay must be reasonable. That argument fails to provide an adequate basis for determining that the agency's delay has been reasonable. The government has not even reported whether an analyst has begun processing the fourth stage of Aslam's name check.

The government's second explanation for CIS's delay—limited FBI resources—is an issue that has no relevance to the present inquiry. The APA imposes a *legal* obligation on CIS to complete name checks within a reasonable period of time. If the FBI's name check process is obstructing compliance with that legal obligation, CIS must either remove the obstruction[7] or accept the legal penalties. Bureaucratic inadequacy is not a justification, especially because the costs of noncompliance are imposed on the applicant.

Accordingly, the first TRAC factor weighs heavily in favor of finding the delay in processing Aslam's application unreasonable.[8]

## B. Competing Interests

The third and fifth TRAC factors direct the Court to look at the competing interests at stake. *See TRAC,* 750 F.2d at 80 (noting that "delays that might be reasonable in the sphere of economic regulation are less tolerable when human health and welfare are at stake" and instructing the court to "take into account the nature and extent of the interests prejudiced by delay").

As the government rightly concedes, CIS's delay has materially hindered Aslam's life and livelihood. He cannot travel internationally despite having family abroad, and his job prospects are limited by his immigration status. By delaying final adjudication of Aslam's application for adjustment of status, CIS also pushes the usual goal of a lawful permanent resident—U.S. citizenship—further off into the horizon. *See* 8 U.S.C. § 1427(a) (re-

---

7. For instance, CIS could reduce the demands on the FBI by prioritizing name check requests, developing alternative methods of collecting the same information, allocating funds to the FBI to hire additional personnel, or lobbying the political branches to increase the FBI's funding.

8. Because Congress has not identified any particular timetable within which CIS must complete processing of status adjustment applications, the second TRAC factor is inapplicable. *See TRAC,* 750 F.2d at 80 ("[W]here Congress has provided a timetable or other indication of the speed with which it expects the agency to proceed in the enabling statute, that statutory scheme may supply content for this rule of reason.").

quiring a permanent resident to have resided continuously in the United States for five years preceding the date of filing of his naturalization application).

As for CIS's interests, the government repeatedly invokes the mantra of national security: "mandating a decision without the benefit of the FBI's complete analysis would require CIS to adjudicate those applications that it knows (given the passage of time without FBI completion) are the most likely to be inimical to our national security." This is rank speculation. There is no evidentiary basis to assert a nexus between the pendency of Aslam's name check and a threat to national security because CIS does not inquire into the reasons behind the FBI's delay. For all the Court knows, Aslam's name check file is sitting in an analyst's inbox collecting dust. This is why the Court has repeatedly urged the government to submit particularized information about the progress of Aslam's name check.[9] *Cf. Liu,* 2007 WL 2433337, at *6 ("[M]ere invocation of national security, without a particular explanation of how it caused the delay, is insufficient to justify delay.").

The government's own conduct further belies its stated national security concerns in this case. Aslam arrived in the United States in 1990, has completed several educational degrees, and has maintained active employment. He has had an I–485 application pending with CIS and its predecessor agency since 1996. As part of those processes, Aslam has submitted all documentation and records requested by CIS, has appeared for every interview scheduled with a CIS adjudicator, and has successfully cleared all other secondary background checks. Despite every opportunity over the past 18 years, CIS has not collected any information suggesting that Aslam is a security threat, nor has it un-

dertaken any effort to remove him from this country.

Accordingly, the Court finds that the third and fifth TRAC factors weigh in favor of finding CIS's delay unreasonable.

## C. Effect of Expediting Delayed Action on Agency

Under the fourth TRAC factor, the Court must "consider the effect of expediting delayed action on agency activities of a higher or competing priority." *TRAC,* 750 F.2d at 80.

The government argues that any order directing CIS to complete its adjudication of Aslam's application would be "fundamentally unfair to those who either have waited patiently or lack the resources to institute legal action." That argument has no merit. A full review of the record demonstrates that Aslam has more than "waited patiently" for CIS to finish its adjudication. He has complied with every request for additional information and, before filing this civil action, he inquired with CIS about his application. Furthermore, the prospect that other applicants deprived of timely adjudications may follow Aslam and seek judicial recourse is no justification for withholding relief that is legally warranted.

Because the government has not identified any genuine harm to the agency were the Court to grant relief to Aslam, the fourth TRAC factor weighs in favor of a finding of unreasonableness.

## D. Agency Impropriety

The last TRAC factor directs courts to examine the motives behind the agency's delay. *See TRAC,* 750 F.2d at 80 ("[T]he court need not find any impropriety lurking behind agency lassitude in order to

---

9. Because such a disclosure might contain classified or sensitive material, the Court invited the government to file a pleading under seal for *in camera* review.

hold that agency action is unreasonably delayed.") (internal quotations and citation omitted). The government highlights CIS's decision to re-interview Aslam and update other necessary background investigation materials "to allow for timely adjudication upon the receipt of [the name check] results." It also cites to efforts by the FBI between fiscal years 2003 and 2005 to improve the name check reporting process—securing more personnel, hiring efficiency consultants, and exploring new automation techniques—to show that the agency has not been unresponsive to the backlog.

The most recent data set on this issue speaks for its itself:

> FBI name checks may be the single biggest obstacle to the timely and efficient delivery of immigration benefits. The problem of long pending FBI name check cases *worsened* during the reporting period.... While the percentages of long-pending cases compared to last year are similar, the absolute numbers have increased. There are now 93,358 more cases pending the name check than last year. Perhaps most disturbing, there are 31,144 FBI name check cases pending more than 33 months as compared to 21,570 last year—over a 44 percent increase in the number of cases pending more than 33 months.

Department of Homeland Security, Citizenship and Immigration Services Ombudsman Annual Report 37 (June 11, 2007) (citing USCIS FBI Pending Name Check Aging Report). Furthermore, despite its status as the contracting agency, there is no evidence of any efforts by CIS to take responsibility for and help remedy the existing name check process. Rather, CIS forwards the request to the FBI and then disclaims any accountability for a delay. This is the very definition of agency recalcitrance—an inability or unwillingness to fix an obvious problem that it helped to create.

CIS's decision to await an FBI name check does not vitiate its legal responsibility under the APA to complete its adjudication within a reasonable time period. In light of the above TRAC factors and the government's failure to present particularized evidence that explains the FBI's delay, the Court will compel agency action under 5 U.S.C. § 706(1).

### III. Relief

■ Aslam requests an order requiring CIS to adjudicate his I–485 application within a particular period of time. CIS maintains that completion of the FBI name check is indispensable to a full and fair adjudication of the application. However, CIS has discretion to select its investigatory methods and it retains the ability to control their pace. *See* Cannon Decl. ¶ 18 (noting that "USCIS [may] direct[ ] that a name check be handled on an 'expedited basis' "). Because of the unreasonable delay in the processing Aslam's name check and the government's inability or unwillingness to proffer specific reasons for the delay, the Court finds that CIS must expedite review of this application.

Accordingly, the Court will grant plaintiff relief to the extent that it will order CIS to direct the FBI to expedite its processing of Aslam's name check.[10] If the FBI is unable to complete the name check within 90 days, CIS shall direct the FBI to identify in detail the specific issues that

---

10. Several other district courts have adopted this approach. *See Shaikh v. Gonzales,* No. C 07–0506, 2007 WL 4259410, at *3 (N.D.Cal. Dec. 3, 2007); *Liang v. Attorney General,* No. 07–2349, 2007 WL 3225441, at *8 (N.D.Cal. Oct. 30, 2007); *Lopez v. Sec'y of Homeland Security,* No. 607–CV–735, 2007 WL 3171312, at *2 (M.D.Fla. Oct. 25, 2007); *see also Shah,* 2007 WL 3232353 at *5 n. 3

are preventing the completion of the name check. CIS shall then report those reasons to the Court. If the FBI completes the name check within that time period, CIS shall complete its adjudication of Aslam's application within 60 days of receiving the FBI's report and file a certification informing the Court of the disposition.

The Court will retain jurisdiction over this matter to ensure compliance with its order.

### Conclusion

For these reasons, plaintiff's Motion for Summary Judgment will be GRANTED IN PART and DENIED IN PART and defendants' Motion for Summary Judgment will be GRANTED IN PART and DENIED IN PART.

A separate order consistent with this memorandum opinion will be entered.

### ORDER

For the reasons stated in open court and in the accompanying Memorandum Opinion, plaintiff's Motion for Summary Judgment is GRANTED IN PART and DENIED IN PART [36], defendants' Motion for Summary Judgment is GRANTED IN PART and DENIED IN PART [30], and it is hereby

ORDERED that the Attorney General Michael Mukasey and Director Robert S. Muller be and are DISMISSED from this civil action, and it is further

ORDERED that, within eleven (11) days of the filed date of this order, United States Citizenship and Immigration Services ("CIS") instruct the Federal Bureau of Investigation ("FBI") to expedite its processing of plaintiff's name check. If the FBI is unable to complete the name check within ninety (90) days, CIS shall direct the FBI to identify in detail the specific issues that are preventing the completion of the name check and CIS shall report those reasons to the Court. If the FBI completes the name check within

that time period, CIS shall complete its adjudication of Aslam's application within sixty (60) days of receiving the FBI's report and shall file a certification informing the Court of the disposition.

The Court will retain jurisdiction over this matter to ensure compliance with its Order.

The Clerk is directed to forward copies of this Order to counsel of record and plaintiff *pro se* at the address listed in the case file.